IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–02590–EWN–BNB

LUIS ALVARIZA,
MERRI BETH BALDWIN,
REBECCA GUTIERREZ, and
KATHERINE BOAZ,

      Plaintiffs,

v.

HOME DEPOT,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is an employment discrimination case.  Plaintiff Rebecca Gutierrez instituted this action against Defendant Home Depot, asserting claims for: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (2006) ("ADEA"); (2) race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2006) ("Title VII"); and (3) promissory estoppel.  This matter is before the court on "Defendant's Motion for Summary Judgment on Claims of Plaintiff Gutierrez and Brief in Support" (#51), filed on August 21, 2006.  Jurisdiction is premised upon 28 U.S.C. §§ 1331, 1367 (2006).

# FACTS

### 1.    *Procedural History*

On December 20, 2005, Plaintiff Gutierrez and three other plaintiffs (collectively,

"Plaintiffs") filed their complaint in this court.  (Verified Compl. and Demand for Trial by Jury

[filed Dec. 20, 2005].)  On January 30, 2006, Plaintiffs filed an amended complaint, asserting

claims for age, gender, and race discrimination as well as claims based on the theory of

promissory estoppel.  (Verified Am. Compl. and Demand for Trial by Jury [filed Jan. 30, 2006]

[hereinafter "Compl."].)

On August 21, 2006, Defendant filed four motions for summary judgment, addressing the

claims of each Plaintiff separately.  (Def.'s Mot. for Summ. J. on Claims of Pl. Gutierrez and Br.

in Supp. [filed Aug. 21, 2006] [hereinafter "Def.'s Br."]; Def.'s Mot. for Summ. J. on Claims of

Pl. Baldwin and Br. in Supp. [filed Aug. 21, 2006]; Def.'s Mot. for Summ. J. on Pl. Alvariza's

Claims and Br. in Supp. [filed Aug. 21, 2006]; Def.'s Mot. for Summ. J. on Pl. Katherine Boaz's

Claims and Br. in Supp. [filed Aug. 21, 2006].)  In its motion concerning Plaintiff Gutierrez

(hereinafter "Plaintiff"), Defendant asserts: (1) Plaintiff's claims must be restricted to a limited

period of time; (2) Plaintiff cannot establish constructive discharge under Title VII or the ADEA;

(3) Plaintiff's age discrimination claim fails because she cannot make a showing of adverse

employment action, disparate treatment, or pretext; (4) Plaintiff's gender discrimination claim fails

because she cannot use a handful of isolated sexist comments to prove that gender played a role in

actions against her; (5) Plaintiff lacks any evidence supporting her race discrimination claims; and

(6) Plaintiff's promissory estoppel claim is unsupported by the law or evidence.  (Def.'s Br. at

8–21.)  On November 7, 2006, Plaintiff filed her response.  (Pl. Rebecca Gutierrez's Resp. to

Def.'s Mot. for Summ. J. [filed Nov. 7, 2006] [hereinafter "Pl.'s Resp."].)  On November 21,

2006, Defendant filed its reply.  (Def.'s Reply Br. in Supp. of Mot. for Summ. J. on Pl.

Gutierrez's Claims [filed Nov. 21, 2006] [hereinafter "Def.'s Reply"].)

On November 6, 2006, Plaintiffs filed a motion for sanctions based on alleged abuses of

the discovery process by Defendant.  (Mot. for Sanction of Adverse Inferences under Fed. R. Civ.

Pro. 37[c] [filed Nov. 6, 2006].)  Therein, Plaintiffs requested sixty-three adverse factual

inferences that would undermine Defendant's summary judgment motions.  (*Id.* at 12–40.)  On

November 7, 2006, I referred the motion to Magistrate Judge Boland.  (Mem. [filed Nov. 7,

2006].)  On March 1, 2007, Magistrate Judge Boland issued an order denying Plaintiffs' motion

for sanctions.  (Order [filed Mar. 1, 2007].)

**2.**     ***Factual Background***

   ***a.***     ***Overview***

Plaintiff is a Hispanic female born on August 2, 1951.  (Def.'s Br., Undisputed Facts ¶ 1;

*admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 1.)  Plaintiff began working for Defendant as

a training coordinator in August 1996, and by November 1999 she became a District Human

Resources Manager ("District HRM").  (*Id.*, Undisputed Facts ¶ 2; *admitted at* Pl.'s Resp., Resp.

to Undisputed Facts ¶ 2.)  As District HRM, Plaintiff was rated as a "Performer" in her 2000 and

2001 performance evaluations.  (*Id.*, Ex. A at 43–45 [Gutierrez Dep.].)  "Performer" is one step

above the lowest tier of Defendant's four-tiered performance evaluation scheme.  (*See id.*, Ex. G

at 2 [Performance and Development Summary].)  At the time, Plaintiff acknowledged she

exhibited organizational and time management weaknesses.  (*Id.*, Undisputed Facts ¶ 4; *admitted

in relevant part at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 4.)

In early 2002, Defendant restructured its human resources functions, eliminating District HRM positions.  (*Id.*, Undisputed Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 5.)  In place of District HRMs, Defendant placed Human Resource Managers in each of its stores ("Store HRMs").  (*Id.*)  Store HRMs were to report to a Divisional Human Resource Manager ("Divisional HRM").  (*Id.*)  Plaintiff applied for a Divisional HRM position, but was not selected. (*Id.*, Undisputed Facts ¶ 7; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 7.)  Plaintiff admits that the interview did not go well and that she neglected to submit an updated résumé. (*Id.*)

Plaintiff was offered a Store HRM position, which she accepted.  (*Id.*, Undisputed Facts ¶ 8; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 8.)  Plaintiff worked as a Store HRM in Defendant's Greeley, Colorado store from February 2002 until she resigned, claiming constructive discharge, on May 24, 2004.  (*Id.*, Undisputed Facts ¶ 9; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 9.)

### b.    *Plaintiff's Performance as Store HRM*

In January 2004, Store Manager Chris Sylling wrote up Plaintiff after District Manager Robert Hardy conducted a store review and noted that Plaintiff had not been consistently reviewing records of hourly employees' time sheets.  (*Id.*, Ex. E [Discussion Tracking Form].)  In a disciplinary write-up bearing Plaintiff's signature, Mr. Sylling noted that eighteen employees had at least twelve "late occurrences" since August 2003.  (*Id.*)  Mr. Sylling further noted that nine of those eighteen employees had "severe violations," ranging from a low of twenty-three "late occurrences" to a high of sixty-three.  (*Id.*)  Mr. Sylling wrote that Plaintiff had not adequately monitored the employees and had not disciplined them for these violations.  (*Id.*)

In April 2004, Plaintiff received the lowest tier "Improvement Required" rating on her performance review based primarily on her failure to implement Defendant's attendance policy. (*Id.*, Ex. G at 2 [Performance and Development Summary].)  In a contemporaneous self-assessment, Plaintiff gave herself a "Performer" rating and noted that she needed to improve, *inter alia*, her attention to administrative detail.  (*Id.*, Ex. F [Self-Assessment].)

In May 2004, Plaintiff met with her supervisors to discuss her "Final Counseling Performance Notice" ("Final Notice").[1]  (*Id.*, Ex. A at 179 [Gutierrez Dep.], Ex. H [Final Notice].)  The Final Notice outlined a variety of categories of specific performance deficiencies, such as: (1) failing to monitor and execute the attendance policy; (2) missing a number of deadlines set by the Divisional HRM; (3) inconsistency in performing daily human resources functions; and (4) problematic relations with hourly employees.  (*Id.*, Ex. H at 1–2 [Final Notice].)  The Final Notice set forth a plan of "Action and Improvement Required of [Plaintiff]," outlining specific goals for Plaintiff to achieve in order to improve her performance.  (*Id.*, Ex. H at 2–3 [Final Notice].)  Just above Plaintiff's signature, the Final Notice states: "If immediate improvement is not observed, significant progress is not sustained, or an acceptable level of performance is not met within [ninety] days, [Plaintiff's] employment will be terminated."  (*Id.*, Ex. H at 3 [Final Notice].)

---

[1]Making much ado about nothing, Plaintiff vigorously disputes Defendant's characterization of the Final Notice as a "Performance Improvement Plan" or "PIP."  (Pl.'s Resp, Resp. to Undisputed Facts ¶¶ 14–16.)  Rather than spill further ink engaging Plaintiff's puzzling attempt to distinguish "po-tay-tos" from a "po-tah-tos," I indulge Plaintiff's fervent disavowal of the term by replacing any reference to a "PIP" with a bracketed reference to a "Final Notice" in quoted materials.

### c.      *Plaintiff's Resignation*

After implementation of the Final Notice, Plaintiff's supervisors continued to notice a variety of performance issues, including her improper handling of the termination of an employee, her failure to give another employee a verbal or final warning prior to her termination for attendance policy violations, and her failure to give adequate hours to a full-time employee.  (*Id.*, Ex. I at 1–3 [Management Emails].)[2]  Based on these issues, Mr. Hardy told Divisional HRM Richard Leo in a May 18, 2004 email (the "May 18 Email") that "currently with [Plaintiff] being on [Final Notice] and these issues now arising, I believe that based on the content of the [Final Notice] that her employment should be terminated."  (*Id.*, Ex. I at 3 [Management Emails].)

The May 18 Email was included in the history of an email from Mr. Leo to Sandie Bowen, which addressed the reinstatement of the employee whose dismissal Plaintiff was accused of handling improperly.  (*Id.*, Ex. I at 1 [Management Emails].)  Plaintiff was carbon copied on this email and read the May 18 Email in its history.  (*Id.*, Ex. I at 1 [Management Emails], Ex. A at 234–35 [Gutierrez Dep.].)  Plaintiff testified that after she read the email, she left early for lunch and, after lunch, called Mr. Sylling to tell him she was quitting.  (*Id.*, Ex. A at 236 [Gutierrez Dep.].)

### c.      *Allegations of Discrimination*

Plaintiff asserts that Mr. Leo and Mr. Hardy discriminated against her based on her age, race/national origin, and gender.  (*Id.*, Undisputed Facts ¶ 26; *admitted in relevant part at* Pl.'s

---

[2]Without citation to the record, Plaintiff attacks the performance problems outlined in the emails, baldly asserting: "None of these things occurred."  (Pl.'s Resp., Resp. to Undisputed Facts ¶ 17.)  Plaintiff cannot create an issue of fact with such a self-serving, conclusory allegation.  *See Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) (stating "unsupported conclusory allegations . . . do not create a genuine issue of fact" on summary judgment).

Resp., Resp. to Undisputed Facts ¶ 26.)  Plaintiff also testified that she believed Mr. Hardy

targeted her for criticism after she herself criticized Mr. Hardy's work performance.  (*Id.*,

Undisputed Facts ¶ 25; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 25.)  Plaintiff

testified that she believed Mr. Leo treated her differently because: (1) of past differences of

opinion; and (2) she had previously recommended that he not be hired for a Divisional HRM

position.  (*Id.*, Undisputed Facts ¶ 24; *admitted in relevant part at* Pl.'s Resp., Resp. to

Undisputed Facts ¶ 24.)

In deposition, the following exchange took place:

| | |
|---|---|
| Q: | Do you believe that you were given a poor review because of your opposition to Richard Leo becoming a division HRM? |
| A: | In part. |
| Q: | What was the other part? |
| A: | Rob Hardy. |
| Q: | And what do you mean by that? |
| A: | Rob Hardy liked young, pretty, in his own words "Barbie-like" females.  I was not young.  I was not pretty.  I was not Barbie-like. |
| Q: | When did Rob Hardy tell you that he preferred young, pretty, Barbie-like females? |
| A: | On numerous occasions.  And he would come in my store and he would say, "I hate coming to this store.  I don't have anything to look at.  Can't you enhance the view of the front end?" |
| Q: | And you recall him saying that to you? |
| A: | On more than one occasion, and in the presence of others. |

(*Id.*, Ex. A at 200 [Gutierrez Dep.].)  Plaintiff did not specify when any of these "numerous"

exchanges took place.  (*Id.*)

Plaintiff also asserts that in January 2004, she overheard a conversation between Mr.

Hardy and some other male employees in which the men talked about "female anatomy" and used

"foul language."  (*Id.*, Ex. A at 269–70 [Gutierrez Dep.].)  Plaintiff overheard this discussion

from an office within earshot of the computer room in which it took place.  (*Id.*)

Finally, Plaintiff asserts that when she was a District HRM in 2001, she once heard Mr. Hardy noting that he "liked looking at" a particular employee because "[s]he looked like a Barbie" and on another date overheard Mr. Hardy comment that two female cashiers were attractive. (*Id.*, Ex. A at 203–05 [Gutierrez Dep.].) Plaintiff confronted Mr. Hardy and told him his comments were inappropriate. (*Id.*) After that, Plaintiff admitted: "I don't know that he stopped [making such comments]. I know that he curtailed it in my presence." (*Id.*)

Although Plaintiff was an experienced human resources professional, with full knowledge of Defendant's policy against discrimination and harassment and its mechanisms for reporting and investigating such behavior, she never complained to Defendant about discrimination or harassment of any kind. (*Id.*, Undisputed Facts ¶ 30; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 30.) Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 25, 2004, alleging race, sex, and age discrimination. (*Id.*, Undisputed Facts ¶ 31; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 31.)

### d.    *Employment Relationship*

Plaintiff was an at-will employee and did not have a written employment contract. (*Id.*, Undisputed Facts ¶¶ 32, 34; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 32, 34.) Plaintiff understood that there was no restriction on Defendant's ability to terminate her for poor performance. (*Id.*, Undisputed Facts ¶ 33; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 33.) Plaintiff believes she has an oral contract based on her understanding, drawn from Defendant's Code of Conduct, bulletin boards, and tapes, that Defendant's "philosophy" was that "if you lived the values and do your job, you will be employed and have gainful employment opportunities." (*Id.*, Undisputed Facts ¶ 35; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶

35.)  Defendant's Code of Conduct states: "This Code of Conduct in no way alters the basic employment at will policy of [Defendant].  Associates are free to terminate their relationship with [Defendant], and [Defendant] is likewise free to terminate its relationship with an associate at any time with or without cause and without notice."  (*Id.*, Undisputed Facts ¶ 36; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 36.)

## ANALYSIS

### *1.*  *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead' designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2006).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.    *Evaluation of Claims***

**a.    *Preliminary Matter***

Plaintiff relies heavily on her own sworn affidavit to oppose Defendant's motion for summary judgment.  (*See* Pl.'s Resp., *passim*.)  The affidavit states:

1.    I am a Plaintiff in this case.
2.    The information in this Affidavit . . . is true and correct to my knowledge, information and belief.
3.    I have reviewed Section II, entitled, "Response to Statement of Undisputed Material Facts."  All statements . . . therein are true and correct to my knowledge, information and belief, and I swear to them under penalties of perjury as if fully set forth in this Affidavit.
4.    I have reviewed Section III, entitled, "Statement of Additional Disputed Facts."  All statements . . . therein are true and correct to my knowledge, information and belief, and I swear to them under penalties of perjury as if fully set forth in this Affidavit.
5.    Further Affiant sayeth naught.

(*Id.*, Ex. 6 [Gutierrez Aff.].)  Plaintiff cites to the affidavit as evidentiary support of twelve denials of Defendant's statement of "Undisputed Facts."  (*Id.*, Resp. to Undisputed Facts ¶¶ 4, 7, 11, 17–19, 21, 23, 34, 27–29.)  Plaintiff also uses the affidavit as the sole evidentiary support for all but a handful of her thirty-four "Additional Disputed Facts."  (*Id.*, Statement of Additional Disputed Facts ¶¶ 1–7, 9–17, 19, 23–34.)

The statements in Plaintiff's Response that Plaintiff attempts to incorporate as her sworn testimony can be divided into a number of categories, many of them overlapping: (1) hearsay statements; (2) irrelevant statements; (3) patently self-serving conclusory allegations; (4) statements that could not plausibly be premised upon personal knowledge; (5) statements that are too vague, incoherent, or incomplete to be useful; (6) statements that contradict her deposition testimony; and (7) statements that might actually be admissible. (*Id.*, Resp. to Statement of Undisputed Facts, *passim.*, Statement of Additional Disputed Facts, *passim.*) For example, Plaintiff makes the following "factual" assertions: (1) "Mr. Leo was neither human nor a resource — but that was his job;" (2) "The older women [working for Defendant] were left feeling adrift, while other younger, more attractive people were doted upon by Managers who should be trained better;" and (3) "This pattern of sexist remarks is not limited to an isolated instance in an accessible computer room. Mr. Hardy . . . set the tone each and every time he came into the store where [Plaintiff] was working. He was on a mission — put out to pasture older women, and hire younger, prettier women — and he let [Plaintiff] know this on a regular basis." (*Id.*, Statement of Additional Disputed Facts ¶¶ 21, 30, 5.)

The court is unimpressed with Plaintiff's transparent attempt to short-circuit summary judgment proceedings. The court is disinclined to allow Plaintiff to sidestep a lack of evidence supporting her claims by submitting an affidavit that merely incorporates factual allegations tailored to create factual disputes that would defeat summary judgment. Consequently, I find that Plaintiff's affidavit falls far, far short of the requirements of Federal Rule of Civil Procedure 56(e), which states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is

competent to testify to the matters stated therein." Indeed, the Tenth Circuit has previously found

no abuse of discretion took place when a district court decided to strike an affidavit "because its

submission 'represent[ed] an attempt to create a sham issue of fact,' and because the court was

convinced, after considering [the affiant's] deposition testimony, that 'plaintiffs were deliberately

sandbagging defendants.'" *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 855 (10th Cir. 1999)

(quoting the lower court's opinion). While the court recognizes that a handful of the statements

Plaintiff attempts to incorporate into her affidavit might well have been admissible had they been

presented in a more regular manner, it is not this court's duty to cull through Plaintiff's

submissions to separate the wheat from the chaff. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003,

1019 (10th Cir. 2002) (holding "we need not sift through the record in an attempt to find

evidence" in support of conclusory allegations in verified complaint). Below, I only consider the

allegations in Plaintiff's affidavit to the extent necessary to demonstrate her failure to marshal

admissible evidence in support of her opposition to Defendant's motion.

### b. *Discrimination Claims*

Although they arise under different statutes, ADEA and Title VII discrimination claims are

analyzed identically. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 936 (10th Cir. 2005); *see* 42

U.S.C. § 2000e *et seq.* (2006) (Title VII); 29 U.S.C. § 621 *et seq.* (2006) (ADEA).

Discrimination can be proven by direct evidence — *i.e.*, evidence that, if believed, proves the

existence of a fact in issue without inference or presumption. *Garrison*, 428 F.3d at 936; *Mitchell

v. City of Wichita*, 140 Fed. App'x 767, 778 (10th Cir. 2005). When a party has no direct

evidence of discrimination, she must rely on the *McDonnell Douglas* framework of presenting

indirect evidence of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

At the first stage of the *McDonnell Douglas* analysis, Plaintiff is required to present a *prima facie* case of discrimination by showing: (1) Plaintiff belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002). I refrain from outlining the further stages of the *McDonnell Douglas* framework because Plaintiff has so unequivocally failed to come forward with proof supporting her *prima facie* case.

### *(1)   "Direct" Evidence of Discrimination*

As set forth above, direct evidence of discrimination is evidence that, if believed, proves the existence of a fact in issue without inference or presumption. *Mitchell*, 140 Fed. App'x at 778. Plaintiff first points to the following "direct" evidence:

> During his deposition, Mr. Sylling was shown a yellow pad upon which he had recorded notes from conversations he had with Mr. Hardy. The notes indicate that Mr. Sylling was asked, "who are Greeley's top-ten associates?" and "must have [five percent] on ['Improvement Required' performance ratings] — how do we move our low performing associates out of the building?"

(Pl.'s Resp. at 18.) Plaintiff emphasizes that Mr Sylling's yellow pad indicates that Mr. Hardy also asked: "Where are our highest paid associates?" (*Id.* at 18, Ex. 11 at 1 [Sylling Notes].)

Plaintiff then proceeds to argue:

> The foregoing statements, taken in context of [Plaintiff's] subsequent placement on [Final Notice], coupled with the sexist and age based remarks she was forced to endure is direct evidence which supports an *inference* that [Defendant] discriminated against [Plaintiff] on the basis of her age. It is reasonable to *infer* that an associate who is among the highest paid is one with the longest tenure and, therefore, *arguably* the oldest . . . . The questions are direct evidence that discriminatory animus was a factor in [Defendant's] decision to terminate [Plaintiff].

(*Id.* at 18 [emphases added].)  It is difficult to know where to begin with Plaintiff's argument.[3]

First, any evidence that requires a factfinder to consider it together with other evidence and then,

in Plaintiff's own words, make an "inference" of discrimination is *most certainly not* "direct"

evidence of discrimination.  *See Mitchell*, 140 Fed. App'x at 778 (stating direct evidence proves a

fact *without* inference or presumption).  Second, because it would be patently *unreasonable* to

infer age-based animus from Mr. Hardy's general questions concerning salaries and employee

performance, his questions cannot be construed as indirect evidence of discrimination under the

*McDonnell Douglas* scheme.  *See Hysten*, 296 F.3d at 1181.  Finally, I emphasize that Mr.

Hardy's questions, which are memorialized in Mr. Sylling's notes, appear to be inadmissible

hearsay statements.  *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by

the declarant while testifying . . . .").  Plaintiff has failed to demonstrate that these questions

constitute admissible evidence.  *See World of Sleep*, 756 F.2d at 1474 (stating that court may only

consider admissible summary judgment evidence).

### *(2)     Indirect Evidence — Plaintiff's* **Prima Facie** *Case*

Defendant argues that Plaintiff has not proven her *prima facie* case as to any of her claims,

spilling much ink over whether Plaintiff has suffered an adverse employment action in the form of

constructive discharge.  (Def.'s Br. at 9–13.)  At the center of Defendant's argument, however,

sits a broader critique of Plaintiff's case: she has come forward with no evidence supporting an

inference that anything that transpired while she worked for Defendant supports a reasonable

inference of age, race, or gender discrimination.  (*See id.* at 9–20.)  It is difficult to pin Plaintiff

---

[3]The foregoing block quotation ought to give the reader a troubling glimpse into the
difficulty of meaningfully engaging Plaintiff's haphazard, underdeveloped, illogical, ill-informed,
inconsistent, under-researched brief.  (*See* Pl.'s Resp., *passim.*)

down to one precise version of her case: at times she agrees that her constructive discharge was the only adverse employment action to which she was subjected, at other times she argues that her Final Notice constituted an adverse employment action, and at times she appears to claim she suffered from a broad pattern of disparate treatment.  (*See* Pl.'s Resp., *passim*.)  No matter what form Plaintiff's protean allegations take, I find that she has failed to come forward with requisite proof of her claims.

### *(a)    Race Discrimination*

Defendant argues that Plaintiff has come forward with no evidence that she was discriminated against based on her race or national origin.  (Def.'s Br. at 20.)  Plaintiff does not respond to this argument, but does appear to confess the point when she states: "In this action, [Plaintiff] seeks relief under the [ADEA] and on the basis of sex [sic] in violation of Title VII . . . ."  (Pl.'s Resp. at 2.)  Other than occasional references to herself as a "Hispanic" and her superiors as "white," the question of race or national origin discrimination simply does not arise in Plaintiff's response.  (*See id.* at 8, 20.)  Of course, the mere fact that Plaintiff's superiors were white does not support an inference of discrimination.

I find that Defendant met its burden of showing of an absence of evidence supporting any race and national origin discrimination claim, and, thus, the burden shifted to Plaintiff to demonstrate a genuine issue for trial on the question.  *Celotex*, 477 U.S. at 325.  Plaintiff cannot satisfy her burden with silence.  Accordingly, I find that Defendant is entitled to summary judgment on Plaintiff's race and national origin discrimination claims.

### (b)      Gender and Age Discrimination

As set forth above, regardless of whether her claim is for age or gender discrimination, Plaintiff is required to present a *prima facie* case of discrimination by showing: (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Hysten*, 296 F.3d at 1181.  "Adverse employment action" is defined as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1150 (10th Cir. 2005).  Below, I consider whether Plaintiff's alleged constructive discharge, poor performance evaluations, and non-selection for Divisional HRM position constitute an "adverse employment action."

1.  CONSTRUCTIVE DISCHARGE — Under Title VII, "[c]onstructive discharge, like actual discharge, is a materially 'adverse employment action.'"  *Rennard v. Woodworker's Supply, Inc.*, 101 Fed. App'x 296, 308–09 (10th Cir. 2004) (citing *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 [7th Cir. 2002]).  Defendant asserts that Plaintiff has failed to come forward with evidence supporting the occurrence of a constructive discharge.  (Def.'s Br. at 9–13.)  In response, Plaintiff points to three causes that made her working conditions intolerable: (1) "she found that procedures designed to protect her were being ignored;" (2) "she was not given guidance as to how to improve" her job performance; and (3) she was "subjected to insults of a sexual and age-based nature."  (Pl.'s Resp. at 25.)  Defendant contends that these causes lack evidentiary foundation and are insufficient to establish constructive discharge.  (Def.'s Reply at 3–8.)  For the reasons set forth below, I agree with Defendant.

"In the typical Title VII constructive discharge case, the plaintiff asserts she was forced

from her job due to the alleged [] discrimination." *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th

Cir. 1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742

(1998). Constructive discharge occurs when "'a reasonable person would view the working

conditions as intolerable,'" *Hirschfeld v. N.M. Corr. Dept*, 916 F.2d 572, 580 (10th Cir. 1990)

(quoting *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343 [10th Cir. 1986]), and "the employer by its

illegal discriminatory acts has made working conditions so difficult that a reasonable person in the

employee's position would feel compelled to resign," *Derr*, 796 F.2d at 344. "Essentially, a

plaintiff must show that she had no other choice but to quit." *Sanchez v. Denver Pub. Sch.*, 164

F.3d 527, 534 (10th Cir. 1998) (citations and quotation marks omitted). The occurrence of

constructive discharge depends upon a finding that the working conditions were intolerable on an

objective basis, not upon the subjective view of the employee-claimant. *MacKenzie v. City &*

*County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005) (citing *Irving v. Dubuque Packing Co.*,

689 F.2d 170, 172 [10th Cir. 1982]); *see also Williams v. Giant Food Inc.*, 370 F.3d 423, 434

(4th Cir. 2004) (stating that "dissatisfaction with work assignments, a feeling of being unfairly

criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a

reasonable person to resign").

I now address the three factors Plaintiff contends culminated in her constructive discharge.

First, Plaintiff makes the terse, vague assertion that "procedures designed to protect her were

being ignored." (Pl.'s Resp. at 25.) She neglects to cite the record in support of this vague

assertion. *See Annett*, 371 F.3d at 1237 (stating "unsupported conclusory allegations . . . do not

create a genuine issue of fact" on summary judgment). To the extent Plaintiff is alluding to

-17-

"procedures designed to protect her" from discrimination, this conclusory assertion is difficult to countenance in light of her admission that "she never complained to [Defendant] about discrimination or harassment of any kind."  (Def.'s Br., Undisputed Facts ¶ 30; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 30.)  Indeed, her admission suggests that Plaintiff *herself* ignored "procedures designed to protect her."  Plaintiff does elsewhere suggest that if she had complained of discrimination, those complaints would have gone to Mr. Leo, who himself "participated" in discrimination against her.  (*See* Pl.'s Resp., Statement of Additional Disputed Facts ¶ 29.)  This assertion is doubly unfounded.  First, Plaintiff comes forward with no evidence beyond her vague, conclusory, and therefore inadmissible allegation that Mr. Leo "participated" in discrimination against her.  (*See id.*)  Second, even if she had come forward with such evidence, Plaintiff comes forward with no evidence that Mr. Leo was the only superior in all of Defendant's management structure to whom she could have brought her complaints.  (*See id.*)  While little is clear about Plaintiff's argument, one conclusion is inevitable: Plaintiff cannot use such vague, incomplete evidence to cobble together an issue of fact.

Plaintiff's assertion that she "was not given guidance on how to improve her job performance" is similarly unavailing.  (*Id.* at 25.)  Her Final Notice set forth a long list of specific performance defects and set eight goals for her future performance.  (Def.'s Br., Ex. H at 1–3 [Final Notice].)  The Final Notice clearly and specifically lists performance defects, including: (1) failure to review "Schedule Variance Logs" on a consistent basis; (2) assigning certain part-time employees full-time hours; (3) assigning certain full-time employees part-time hours; (4) failing to turn in a "Spring Recruitment Plan" on time; and (5) sporadic attendance on conference calls.  (*Id.*, Ex. H at 1 [Final Notice].)  The Final Notice also sets forth concrete goals, such as: (1)

meeting all deadlines set by her store manager and Divisional HRM; (2) monitoring and executing

the attendance policy; and (3) creating a list of all key tasks that must be accomplished in a

workweek and reviewing the list on a daily basis to prioritize daily tasks.  (*Id.*, Ex. H at 2–3 [Final

Notice].)  Defendant's expectation that Plaintiff would be capable of performing her job functions

is hardly one that a reasonable person would find intolerable.[4]  *See generally Agnew v. BASF*

*Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (stating criticism in performance reviews and institution

of performance improvement plans, alone, do not constitute objectively intolerable conditions).

This leaves only Plaintiff's allegations that she was subjected to "insults of a sexual and

age based nature."  (Pl.'s Resp. at 25.)  When construed in the light most favorable to Plaintiff,

the nature and frequency of Mr. Hardy's alleged remarks do not rise to a level that a reasonable

person would find intolerable.  In deposition, Plaintiff asserted that in 2001 she confronted Mr.

Hardy regarding inappropriate comments he made about *other* women.  (Def.'s Br., Ex. A at

203–05 [Gutierrez Dep.].)  After she confronted him, Mr. Hardy subsequently curtailed making

such comments in her presence.  (*Id.*)  Plaintiff specifically alleged only one event that took place

in 2004, relatively close to her dismissal: she *overheard* Mr. Hardy and other male employees

engage in boorish conversation, in which profanity was used and references to the female anatomy

were made.  (*Id.*, Ex. A at 269–70 [Gutierrez Dep.].)  Plaintiff also vaguely alleges — without

reference to dates — that: (1) on "numerous occasions," Mr. Hardy told her that he liked

---

[4]If Plaintiff truly needed further guidance on how to do her job, perhaps she was not
capable of performing it in the first place.  Plaintiff's consistently low self-assessments and
performance reviews suggest as much — the record reflects that Plaintiff and her supervisors
consistently rated her as a "Performer," which is the third lowest of four tiers of performance
ratings.  (*See* Def.'s Br., Ex. A at 43, 45 [Gutierrez Dep.], Ex. F [Self-Assessment], Ex. G
[Performance and Development Summary].)

employees who looked like "Barbie" dolls; and (2) on "more than one occasion" Mr. Hardy complained to Plaintiff that the female employees working in the front of the store were not sufficiently attractive. (*Id.*, Ex. A at 200 [Gutierrez Dep.].)  Even casting a most favorable light on Plaintiff's vague allegations, Mr. Hardy's allegedly insistent comments concerning women he found physically attractive would not lead a reasonable person to view Plaintiff's working conditions as intolerable.  Notably, Mr. Hardy was not stationed in the Greeley store where Plaintiff worked and only visited the store "two, three times a week." (*Id.*, Ex. A at 233 [Gutierrez Dep.].)  The inquiry is not whether the Plaintiff's work conditions were "difficult or unpleasant," but whether, at the time Plaintiff quit, Defendant did not allow her "the opportunity to make a free choice regarding h[er] employment relationship." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) (citation and quotation marks omitted).  While certainly annoying and boorish, Mr. Hardy's alleged comments concerning other women were not so "severe that [Plaintiff] simply had no choice but to quit." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000); *cf. Keller v. Bd. of Educ.*, 182 F. Supp. 2d 1148, 1157 (D. N.M. 2001) (holding that constructive discharge claim was supported by record when employee was reassigned to position without job title or description, her office was a supply closet, and her salary was cut by more than one-half).  Accordingly, Plaintiff's constructive discharge claim fails as a matter of law.

2. *FINAL NOTICE AND MAY 18 EMAIL* — To the extent that Plaintiff argues that her April 2004 "Improvement Required" evaluation and consequential placement on a Final Notice constituted an "adverse employment action," I agree with Defendant that such a conclusion is factually unfounded. (*See* Def.'s Br. at 14.)  Indeed, the Tenth Circuit has unequivocally stated:

"A written warning *may* be an adverse employment action *only if* it effects a significant change in the plaintiff's employment status." *Haynes v. Level 3 Commc'ns.*, 456 F.3d 1215, 1224 (10th Cir. 2006) (second emphasis added).

Plaintiff does not argue that the April 2004 evaluation or the Final Review effectuated a significant change in her employment status. (*See* Pl.'s Resp.) Indeed, neither document effectuated a demotion, change in pay, or change in responsibilities. (*See* Def.'s Br., Ex. G [Performance and Development Summary], Ex. H [Final Notice].) Instead, the Final Notice presented Plaintiff with clear goals to achieve her continued employment. (*Id.*, Ex. H at 2–3 [Final Notice].) The Final Notice does warn that: "If immediate improvement is not observed, significant progress is not sustained, or an acceptable level of performance is not met within [ninety] days, [Plaintiff's] employment will be terminated." (*Id.*, Ex. H at 3 [Final Notice].) In light of the undisputed fact that Plaintiff was an at-will employee, the warning can hardly be said to have significantly altered Plaintiff's employment status. (*See id.*, Undisputed Facts ¶ 32; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶ 32.) Accordingly, I find that Plaintiff's April 2004 evaluation and placement on Final Notice do not constitute adverse employment action under Title VII or the ADEA.

To the extent that Plaintiff argues the May 18 Email constitutes an adverse employment action, such argument is also without merit. Plaintiff admitted that Mr. Hardy, the author of the email, lacked the authority to terminate her. (*Id.*, Ex. A at 234–35 [Gutierrez Dep.].) Consequently, his mere recommendation to Mr. Leo that Plaintiff should be terminated cannot constitute action that significantly altered her employment status. *Cf. Orr*, *supra*.

3. *NON-SELECTION FOR DIVISIONAL HRM POSITION* — To the extent Plaintiff argues that her non-selection for a Divisional HRM position constitutes "adverse employment action," I agree with Defendant that her claim for such an adverse action is time-barred.  It is undisputed that at some time prior to February 2002, Plaintiff applied for and was not selected for a Divisional HRM position.  (Def.'s Br., Undisputed Facts ¶¶ 5–7; *admitted at* Pl.'s Resp., Resp. to Undisputed Facts ¶¶ 5–7; *see* Def.'s Br., Ex. A at 82 [Gutierrez Dep.].)

"Discrete acts such as . . . failure to promote . . . are easy to identify.  Each incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice.'" *AMTRAK v. Morgan*, 536 U.S. 101, 114 (2002).  A party alleging discrimination based on such a discrete act as a failure to promote "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.*  Under both the ADEA and Title VII, a party's claims, at least when based on a failure to promote, are limited to events that occurred within three-hundred days of the filing of the a charge of discrimination.  *See* 42 U.S.C. § 2000e–5(e) (2006) (Title VII); 29 U.S.C. § 626(d) (2006) (ADEA).  Because Plaintiff applied for the Divisional HRM job some time before February 2002, I find that the limitations period for bringing a charge of discrimination in connection therewith closed no later than the end of 2002.  Plaintiff filed her EEOC charge in October 2004.  (Def.'s Br., Ex. D [EEOC Charge].)  Accordingly, I find that any claim based on Plaintiff's non-promotion to Divisional HRM is time-barred.

### (c)    *Disparate Treatment*

Plaintiff also asserts she suffered disparate treatment in violation of Title VII and the ADEA.  (*See* Pl.'s Resp. at 23–24; *cf.* Compl. ¶¶ 251–76 [asserting disparate treatment claim under Title VII but not under the ADEA].)  Defendant argues that Plaintiff's claims of disparate

treatment fail for lack of proof that she was treated differently from similarly situated employees. (*Id.* at 15–18.) Citing to *Mackenzie*, 414 F.3d at 1277, Plaintiff argues that to make a *prima facie* showing of disparate treatment under Title VII and the ADEA, she must demonstrate: (1) she was a member of a protected class; (2) she was disciplined; and (3) she was treated differently than similarly situated employees for the same or similar conduct. (Pl.'s Resp. at 23.)  Plaintiff then argues that if she is granted her motion for sanctions for adverse inferences, she will be able to prove that she was treated differently from similarly situated employees. (*Id.* at 23–24.)  Her motion for sanctions was denied. (Order [filed Mar. 1, 2007].)  Plaintiff makes no fallback arguments. (*See* Pl.'s Resp.)  Consequently, I deem the claim confessed.

Even though the claim is confessed, I also find that Defendant met its burden of showing an absence of evidence supporting the third element of a *prima facie* case for disparate treatment under *Mackenzie*, and, thus, the burden shifted to Plaintiff to demonstrate a genuine issue for trial on the question. *Celotex*, 477 U.S. at 325.  Plaintiff has come forward with nothing more than a vague, conclusory, self-serving allegation of disparate treatment: "Messrs. Leo and Hardy disciplined other similarly situated associates much less severely for the same conduct for which [Plaintiff] was accused."  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 24.) Accordingly, I find that Plaintiff has failed to meet her summary judgment burden.  Defendant is thus entitled to summary judgment on Plaintiff's disparate treatment claims.

### c.  *Promissory Estoppel*

Defendant asserts that Plaintiff's promissory estoppel claim fails on a broad variety of grounds, including the fact that: (1) general policy statements do not constitute a promise; and (2) Defendant's Code of Conduct expressly disclaims any intent to enter into a binding employment

contract.  (Def.'s Br. at 19.)  In light of the fact that Plaintiff did not respond to Defendant's

arguments concerning promissory estoppel, I deem the claim confessed.  (*See* Pl.'s Resp.)  Even if

the claim were not confessed, it would fail as a matter of law.

Under Colorado law, the elements of a promissory estoppel claim are: (1) the promisor

made a promise to the promisee; (2) the promisor should reasonably have expected that promise

would induce action or forbearance by the promisee; (3) the promisee in fact reasonably relied on

the promise to the promisee's detriment; and (4) the promise must be enforced to prevent

injustice.  *Berg v. State Bd. of Agric.*, 919 P.2d 254, 259 (Colo. 1996) (citing *Centennial-Aspen*

*II Ltd. P'ship v. City of Aspen*, 852 F. Supp. 1486 [D. Colo. 1994]).

In her complaint, Plaintiff alleges that Defendant made a "commitment to provide a non-

discriminatory work environment, one free from harassment of any kind." (Compl. ¶ 315.)  If

such a patently aspirational commitment to create a workplace "free from harassment of any kind"

was indeed made, I find that it is not one upon which a reasonable person would rely.  Plaintiff

also alleges: "By virtue of the conduct of the parties, a contract of employment was formed . . . ."

(*Id.* ¶ 318.)  While this allegation might suffice to get Plaintiff past a motion to dismiss, I find that

it is too vague — and too obviously self-serving — to get Plaintiff past summary judgment.  *See*

*Annett*, 371 F.3d at 1237.

In deposition, Plaintiff asserted her belief she has an "oral employment contract" based on

her knowledge of Defendant's Code of Conduct, "bulletin boards," and "tapes," which

purportedly state Defendant's "philosophy" that "if you lived the values and do your job, you will

be employed and have gainful employment opportunities." (Def.'s Br., Ex. A at 241–43

[Gutierrez Dep.].)  First, I note that Defendant placed Plaintiff on Final Notice for *failing* to do

her job, so it is not clear how this so-called "philosophy" could be construed to support her claim. Second, even overlooking the myriad absurdities inhering in the premise that statements expressed on a "bulletin board" or in a "tape" could be said to suffice as a basis for the execution of an "oral employment contract," Defendant's Code of Conduct expressly states: "This Code of Conduct in no way alters the basic employment at will policy of [Defendant].  Associates are free to terminate their relationship with [Defendant], and [Defendant] is likewise free to terminate its relationship with an associate at any time with or without cause and without notice." (*Id.*, Ex. K at 4 [Code of Conduct].)  One would expect that Plaintiff, as a human resources manager, would have understood exactly what this language means and how it precludes her specious promissory estoppel claim.  Even if she did not, "[s]ummary judgment denying claims based on a handbook is appropriate if the employer has clearly and conspicuously disclaimed intent to enter a contract limiting the right to discharge employees." *Ferrera v. Nielsen*, 799 P.2d 458, 461 (Colo. Ct. App. 1990).  As the Code of Conduct could not be more clear on this front, I find that Defendant made no promise upon which a reasonable person would have relied.  Accordingly, Plaintiff's promissory estoppel claim fails as a matter of law.

**3.    *Conclusion***

Based on the foregoing it is therefore ORDERED that:

1.    DEFENDANT's motion (#51) is GRANTED.

The clerk shall forthwith enter judgment in favor of Defendant and against Plaintiff Gutierrez, dismissing Plaintiff Gutierrez's claims with prejudice.  Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

Dated this 14th day of March, 2007

BY THE COURT:


<u>s/ Edward W. Nottingham</u>
EDWARD W. NOTTINGHAM
United States District Judge